UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BABETTE J. MEGGISON,

        Plaintiff,

v.

CHARLEVOIX COUNTY, et. al.,

        Defendants.
_____/

CASE NO. 1:07-CV-577

HON. ROBERT J. JONKER

## OPINION

    Plaintiff Babette Meggison brings this action against Charlevoix County and Charlevoix County Sheriff George Lasater, alleging First Amendment retaliation under 42 U.S.C. § 1983 and violations of Michigan's Whistle-Blowers' Protection Act. (First Amended Complaint, docket #37.) Defendants moved for summary judgment on both claims. (Docket #52.) The Court heard oral argument on Defendants' motion on October 16, 2008. (Docket #64.)

### BACKGROUND

    Babette Meggison is the Jail Administrator for the Charlevoix County Sheriff's Office. (Meggison Deposition at 16.) As Jail Administrator, Ms. Meggison performs a wide variety of tasks. She supervises a total of approximately twenty-five corrections officers, food service staff, maintenance staff, and bailiffs. (*Id.* at 24, 187.) She monitors jail conditions for conformance with state and federal guidelines, and oversees routine maintenance projects at the jail. (*Id.* at 24-25, 30-31.) Ms. Meggison's job description states that she is to "[b]ecome familiar with all system aspects of the Charlevoix County Sheriff's Department and implement repairs as needed. Repairs to be

made either by county maintenance people or, if necessary, by private contractors." (Defendants Motion for Summary Judgment, docket #52, Exhibit 2.)  Defendant George Lasater is Ms. Meggison's immediate supervisor. (*Id*.)

       **I.**       **Air Quality Problems Arise at the Charlevoix County Jail**

Sometime in or around November 2003, multiple jail staff members – including Ms. Meggison – began to complain about the air quality at the jail. (*Id.*, Exhibits 3, 5.) Many staff members experienced allergy-like symptoms while on site at the sheriff's office or the attached jail. (*See* Plaintiff's Response, docket #55, Exhibit G.)  In response to these complaints, Northwest Michigan Community Health Department inspected the sheriff's office and jail in November 2003. (*Id.*, Exhibit 3.)  The Health Department recommended that the County commission further testing from a company specializing in industrial hygiene or indoor air quality. (*Id.*)  The Health Department's report was addressed to Ms. Meggison. (*Id.*)

Sheriff Lasater acted on the Health Department's suggestion by instructing Ms. Meggison to contact various environmental consulting firms to obtain price quotes for further testing at the jail. (Meggison at 112-13; *see also* Plaintiff's Response, docket #55, at 11.)  After contacting several companies, Meggison informed Sheriff Lasater that Environmental Testing and Consulting ("ETC") offered the least expensive quote. (Meggison at 116.) Sheriff Lasater submitted ETC's quote to the Charlevoix County Board of Commissioners ("the Board"), and the Board approved further testing. (*Id.* at 116-18.) ETC tested for airborne mold spores at the jail in June 2005. (*Id.* at 112-13, 118-19; *see also* Defendants' Brief in Support, docket #53, Exhibit 5.)

Ms. Meggison received ETC's report in July 2005. (*Id.*)  The report is addressed to "Ms. Babette Meggison, Jail Administrator, Charlevoix County Sheriff's Office." (Defendants'

Brief in Support, docket #53, Exhibit 5.)  The report references Ms. Meggison's concerns over her own health conditions and discusses her role in assisting ETC.  (*See id.*)  Specifically, the report states:

> ETC met with Ms. Babette Meggison (the Jail Administrator) who provided a verbal account of the concerns raised by employees.  Ms. Meggison stated that following the renovation of the Jail complex, (which includes the County Sheriff's Administration offices) she had experienced negative health effects commonly associated with allergies.
>
> *****
>
> ETC noted visibly stained ceiling tiles in this area, but according to Ms. Meggison the stains had not increased in size and no suspect odor had been noted within the building . . . .  ETC did not note any areas of concern above the suspended ceiling of Ms. Meggison's office but did note the presence of dust on the HVAC supply diffuser.  According to Ms. Meggison this diffuser is regularly cleaned, but the dust continues to come back.

(*Id.*)  In her deposition, Ms. Meggison testified that she was the "contact person" between ETC and the jail throughout all phases of the testing process.  (Meggison at 117-18.)

## II. Meggison Works to Remedy the Air Quality Problems

The ETC report concluded that there were air quality problems at the jail, but that mold spores were not the cause of the problem.  (Defendants' Brief in Support, docket 53, Exhibit 5.)  On the basis of this report, Ms. Meggison concluded that the jail was "a sick building."  (Meggison at 120.) Throughout 2005 and 2006, Meggison worked with various outside contractors to identify the source of the air quality problems discovered by ETC.  (*Id.* at 123-30.)  She also attended multiple County Board meetings to discuss ongoing remediation efforts at the jail.  (*Id.* at 136-41.)  At or in preparation for these meetings, Meggison provided the Board with "all the information" regarding

air quality at the jail. (*Id.* at 138.) Meggison testified that she attended these Board meetings in her capacity as Jail Administrator. (*Id.*)

Ms. Meggison was unsatisfied with the pace of remediation efforts at the jail, and she repeatedly voiced her concerns to Sheriff Lasater. (*Id.* at 145.) On February 22, 2007, Meggison met with Sheriff Lasater to inform him that the jail staff felt no one was addressing their concerns over the air quality problems. (Meggison at 149-55; Lasater at 91-92.) As a result of this meeting, Sheriff Lasater wrote the Board and requested "an open meeting with the correction officer staff." (Defendants' Brief in Support, docket #53, Exhibit 13.) In his letter to the Board, Sheriff Lasater stated:

> I would like to give the staff an opportunity to express their concerns and the civil counsel and the Charlevoix County Board of Commissioners explain to the staff exactly what is being done and if we do or do not have a health problem or have ever had a health problem due to air quality.

(*Id.*) On February 27, 2008, the Board informed Sheriff Lasater that concerned staff were invited to attend the Board meeting already scheduled for February 28, 2007. (Lasater at 97-99; Defendants' Reply Brief, docket #61, Exhibit 19.) That same day, Sheriff Lasater notified the jail staff they could "express [their] concerns to the entire Charlevoix County Board of Commissioners and civil counsel at the next board meeting." (*Id.*)

### III. Meggison Speaks at the February 28, 2007 Board Meeting

Ms. Meggison, Sheriff Lasater, and various other jail employees attended the February 28 Board meeting. Meggison and her brother in-law Tom spoke at the meeting. Citing the ETC report and several other studies, Meggison informed the Board that the air quality at the jail was unsafe.

(Defendants' Brief in Support, docket #53, Exhibit 14, DVD Chapter 4.) She responded to various questions from Board members and the County's civil counsel, and then stated:

> "The biggest reason we're here today is not only that everyone is sick and this has been taking, well, we're up to six years now and nothing has been done. Um, the staff at the jail feels like they're being blown off, that there's a cover-up; nobody wants to admit that there's really a problem at the jail, that it's just nuisance dust. We've done a lot of research on this, you can call it whatever you want, but here's documentation that dust causes permanent lung damage."

(*Id.*)

Sheriff Lasater was not pleased with Meggison's statements at the February 28 Board meeting. (Lasater Deposition at 118, 121-22). Shortly after the meeting, he informed the jail staff that there would be an office reorganization effective April 1, 2007. (Plaintiff's Response, docket #55, Exhibit L.) According to the Sheriff, reorganization was necessary to preserve "the good order of the Sheriff's Office. (*Id.*) Sheriff Lasater also transferred "two or three" employees out from under Ms. Meggison's supervision. (Meggison at 186-87.) Additionally, Meggison testified that after the February 28 Board meeting the Sheriff excluded her from a personnel meeting, refused to speak to her, and accused her of having a "clandestine meeting" with a local reporter. (Meggison at 100-03, 179-85; *see also* Plaintiff's Response, docket 55, Exhibit L.) However, Meggison admits she made no attempt to speak to Sheriff Lasater other than to say "hello" or "good morning," and that she did meet with a reporter without informing Sheriff Lasater. (Meggison at 68, 102-03, 183.)

Ms. Meggison claims she suffered severe stress and anxiety as a result of Sheriff Lasater's actions. (*Id.* at 190-91.) According to Meggison, the stress of these incidents made her unable to function at work. (*Id.* 180-81.) On March 9, nine days after she spoke out at the Board meeting, Meggison went on sick leave and has yet to return to work. (*Id.* at 41.) She has not been terminated

and has not quit her job at the jail. (*Id.* at 87.) She filed a worker's compensation claim against Charlevoix County based on her inability to work due to stress, and she filed this lawsuit on May 24, 2007. (*Id.* at 198-99; Notice of Removal, docket #1.)

## ANALYSIS

### I. Summary Judgment Standard

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Jones v. Potter*, 488 F.3d 397, 402 (6th Cir. 2007). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the Court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The ultimate question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

### II. First Amendment Retaliation Claim

Meggison claims that Defendants violated her First Amendment rights by retaliating against her for speaking out at the February 28, 2007 Board meeting. To state a claim under 42 U.S.C. § 1983, Meggison must show that Defendants acted under color of state law to deprive her of her First Amendment rights. *See United Commercial Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 746 (6th Cir. 2004). A prima facie case of First Amendment retaliation requires Meggison to show that (1) she engaged in constitutionally protected speech; (2) Defendants subjected her to an adverse employment action; and (3) the protected speech was a substantial or motivating factor for

the adverse action. *Nair v. Oakland County Community Mental Health Authority*, 443 F.3d 469, 477-78 (6th Cir. 2006). Defendants argue that Meggison fails to satisfy the first two elements of the *Nair* test. (Defendants' Brief in Support, docket #53, at 9-21.) Defendants also argue that, even if Meggison can establish a prima facie case of First Amendment retaliation, Sheriff Lasater is entitled to qualified immunity. (*Id.* at 27.)

### A. Public Employee's are Entitled to First Amendment Protection only When they Speak as Citizens on Matters of Public Concern

The Supreme Court has recognized that "when a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedoms." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). A Government employee retains First Amendment protections for some types of speech, but the scope of the employee's First Amendment rights must be balanced against the Government's right as an employer to "promot[e] the efficiency of the public services it performs through its employees." *Id.* at 417 (quoting *Pickering v. Board of Ed. of Tp. High Sch. Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968)). Consequently, a government employee is entitled to First Amendment protection only where the employee speaks "as a citizen" on "matters of public concern." *Id.* at 417, 421; *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 542 (6th Cir. 2007).

In *Garcetti*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 422. The Court explained that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a citizen." *Id.* at 421-22. Whether an employee has spoken pursuant to employment duties is a question of law for

the court. *Omokehinde v. Detroit Bd. of Ed.*, 563 F. Supp. 2d 717, 724 (E.D. Mich. 2008); *Davis v. Cook Cty.*, 534 F.3d 650, 653 (7th Cir. 2008); *cf. Nair*, 443 F.3d at 478. In addressing this question, the Sixth Circuit has been careful to note that the requirement that the employee "speak as a citizen" is separate and distinct from the requirement that the employee's speech "address matters of public concern." *See Weisbarth*, 499 F.3d at 542 (noting that *Garcetti* affects only the "speak as a citizen" requirement of the First Amendment analysis).

To determine whether an employee speaks pursuant to official duties, the Sixth Circuit looks to the content, audience, setting, and impetus for the employee's speech. *See id.* at 545-46; *see also Haynes v. City of Circleville*, 474 F.3d 357, 362 (6th Cir. 2007). In *Haynes*, a city police officer was terminated after he complained to his supervisor about cutbacks to a canine training program the officer helped administer. (*Id.* 360-61.) The *Haynes* Court began its analysis by detailing the extent of the officer's involvement in the canine training program. *Id.* at 359-60. The court then analyzed the statements made by the officer to his supervisor, and concluded that the statements were "best characterized as [those] of a disgruntled employee upset that his professional suggestions were not followed as they had been in the past." *Id.* at 364. Consequently, the court ruled the officer's statements were made pursuant to his employment duties and entitled to no constitutional protections under *Garcetti*. *Id.*

In *Weisbarth*, the Sixth Circuit held that statements made by a park ranger to a consultant hired by her employer were not protected by the First Amendment. 499 F.3d 538. Plaintiff in that case argued that the statements were protected speech because speaking to a hired consultant was not part of her official employment duties. *Id.* at 544. The court rejected this claim, stating, "*Garcetti* thus implicitly recognized that such ad hoc or de facto duties can fall within the scope of

an employee's official responsibilities despite not appearing in any written job description." *Id.* The court also relied on *Haynes* to support the proposition that "the content of an employee's speech – though not determinative – will inform the threshold inquiry of whether the speech was, in fact, made pursuant to the employee's official duties." *Id.* (citing *Haynes*, 474 F.3d at 357).

### B.  Meggison Did Not Speak as a Citizen

In this case, Meggison did not speak as a citizen when she addressed the Charlevoix County Board of Commissioners on February 28, 2007.  As Meggison herself points out, the substance of her statements that evening was that she and other jail staff felt the County was doing too little to remedy the perceived air quality problems at the jail. (*See* Plaintiff's Response, docket #55, at 6-7.) Viewing Meggison's statements in light of her written job description and actual job performance, a reasonable fact-finder would have to conclude that her speech "owes its existence to her professional responsibilities" at the jail.  *See Weisbarth*, 499 F.3d at 544 (quoting *Garcetti*, 547 U.S. at 421-22).  Therefore, her speech is not protected by the First Amendment and her claim fails as a matter of law.  *See id.*; *Haynes*, 474 F.3d at 364-65.

#### 1.  Meggison's Job Description and Actual Job Performance Show that She Spoke as an Employee

Meggison's written job description is broad.  Amongst other things, it requires her to "[b]ecome familiar with all system aspects of the Charlevoix County Sheriff's Department and implement repairs as needed," and to "[d]evelop, update and administer policies for the operation of the [] Jail." (Defendants' Brief in Support, docket #53, Exhibit 2.) The plain language of this job description seems to indicate that Meggison would have at least some role in furthering air remediation efforts at the jail. Meggison counters that her job description did not require her to go

to the Board to complain about the air quality problems. (Plaintiff's Response, docket #55, at 10-11.) But this argument takes far too narrow a view of what it means to speak "pursuant to official duties." The police officer in *Haynes* was under no formal obligation to write a memo to his supervisor regarding cuts in the canine training program. *See* 474 F.3d at 360. The officer wrote the memo solely to complain about a loss of funding for a program he helped administer. *See id.* The speech was "pursuant to official duties" not because Officer Haynes's job description required him to complain to supervisors, but rather because the complaints arose out of his day-to-day duties as a police officer. *Id.* at 364; *see also Davis v. Cook Cty.*, 534 F.3d 650, 653 (7th Cir. 2008) (finding that a nurse spoke pursuant to her official employment duties because "[w]hile drafting letters of complaint may not be a core job function of a nurse . . . [t]he issues she discusses in the memo concern particular job responsibilities of a registered nurse").

Similar to the police officer in *Haynes*, Meggison's complaints regarding the air quality issue arise out of her day-to-day employment duties. As discussed in more detail below, Meggison was heavily involved with the County's long-running effort to identify and remedy the air quality problems. The fact that her written job description does not specifically include a responsibility to complain to the Sheriff or the Board does not support a finding that she spoke as a citizen. *See id.*; *Garcetti* 547 U.S. 424-25 ("[T]he listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.") To the contrary, the expansive list of duties outlined in Meggison's job description supports the conclusion that her speech "owed its existence" to her role as Jail Administrator. *See id.*

Meggison's actual performance on the job is even stronger support for the conclusion that she spoke pursuant to official employment duties. At least as far back as November 2003, Meggison represented the Sheriff's Office in contacting and securing the services of various consulting companies in an effort to pinpoint the source of the air quality problems. (*See* Meggison at 123-132.) Meggison obtained price quotes for mold testing, arranged for a video probe of jail air ducts, coordinated on-site visits with duct cleaning companies, and contracted with an engineering firm to perform airborne dust and carbon dioxide testing at the jail. (*Id.*) She also supervised jail staff in their internal efforts to clean air vents at the jail. (*Id.* at 126-28.) More importantly, Meggison admits that she attended multiple Board meetings for the purposes of advising the Board about the status of the ongoing remediation efforts at the jail. (*Id.* at 135-37). Meggison testified that she attended these meetings at Sheriff Lasater's request and in her capacity as Jail Administrator of the Charlevoix County Jail. (*Id.*) Meggison argues that she attended the February 28 meeting as a citizen, not as Jail Administrator, but the context of her attendance and the content of her statements at the meeting belie this claim. She attended the February 28 Board meeting because Sheriff Lasater invited jail staff to voice their concerns about the air quality issue. (*See* Meggison at 153-55; Defendants' Brief in Support, docket #53, Exhibit 13.) At the meeting, the Board stated "Now we'll take anyone from the jail that would like to come up and talk to us. Now is a good time, it's open for you." (Defendants' Brief in Support, docket #53, Exhibit 14.) When Ms. Meggison spoke, she purported to speak for the staff as a whole. (*See id.*) (stating "the staff at the jail feels like they're being blown off, that there's a cover-up"). All of these facts support the conclusion that Meggison spoke not as an ordinary citizen, but as a jail employee pursuant to official employment duties.

The undisputed facts regarding Meggison's involvement with the air quality issue and the impetus for her presence at the Board meeting bring her case squarely within the purview of *Garcetti* and *Haynes*. The entire subject matter of Meggison's speech owes its existence to her role as Jail Administrator. Her knowledge of the issue and her obligation to help remedy the problem arose solely as a consequence of her employment. *Cf. Garcetti*, 547 U.S. at 422 ("When he went to work and performed the tasks he was paid to perform, [Plaintiff] acted as a government employee.") In fact, Meggison's own deposition testimony reveals that her concern over the jail's air quality is, at least in part, a product of her own allergy-related side effects. (*See* Meggison at 122-23; *see also* Defendants' Brief in Support, docket #53, Exhibit 5.) Meggison testified that she felt conditions in her office were unsafe. (Meggison at 122-23.) She even moved out of her office and into the jail reception area for one year while waiting for more definitive test results on the existence of mold spores in her office. (*Id.*) Ms. Meggison's concerns over her own health may be entirely justified given the circumstances, but her complaints about the County's inaction are "nothing more than the quintessential employee beef: management has acted incompetently." *See Haynes*, 474 F.3d at 365. Retaliating against Meggison for voicing these concerns may or may not be fair or wise, but it is not unconstitutional. *See Weisbarth*, 499 F.3d at 547; *Cf. Garcetti*, 547 U.S. at 426 ("Our precedents do not support the existence of a constitutional cause of action behind every statement a public employee makes in the course of doing his or her job.")

Moreover, the record is clear that Meggison's attendance at the meeting flows from her February 22 statements to Sheriff Lasater and Sheriff Lasater's subsequent request to the Board. Meggison argues that she was not required to attend the February 28 Board meeting or speak out, but her presence at the meeting and the statements she made there are nevertheless a product of her

status as public employee. *Cf. Weisbarth*, 499 F.3d at 545 ("The fact that Weisbarth was allegedly fired for voicing her concerns over departmental morale and performance issues when explicitly asked to do so by an agent of GPD thus tends to make its action more constitutionally defensible in this instance, albeit it also more difficult to understand.") She cannot claim constitutional protection for those statements simply because Sheriff Lasater invited, rather than ordered, her to attend this particular Board meeting.

> **2. Meggison's Decision to Express her Employment Grievances in a Public Forum Does Not Alter the First Amendment Analysis in this Case.**

Meggison argues that she spoke as a citizen because she spoke in a public forum on a matter of public concern. (Plaintiff's Response, docket #55, at 7-13.) Meggison is correct that the public has an interest in keeping abreast of the health and safety conditions at a public jail, but Sixth Circuit precedent is clear that whether speech touches on a matter of public concern is a separate inquiry from whether the employee speaks as a citizen. *Weisbarth*, 499 F.3d at 547 ("[B]efore asking whether the subject matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking 'as a citizen' or as part of her public job.'") (quoting *Mills v. City of Evansville*, 452 F.3d 646, 647-48 (7th Cir. 2006). Furthermore, the fact that Meggison spoke at a public meeting may weigh in favor of a finding that she spoke as a citizen, but it cannot alter the fundamental nature of her speech. *See Garcetti*, 547 U.S. at 420 (noting that audience is not dispositive); *Weisbarth*, 499 F.3d at 545 (stating that the "pursuant-to-official-duty requirement ultimately cannot be divorced from the content of the speech"); *Omokehinde v. Detroit Bd. of Ed.*, 563 F. Supp. 2d 717, 726 (E.D. Mich. 2008) ("external communications are not automatically entitled to [First Amendment] protection").

In *Omokehinde,* the Eastern District of Michigan addressed a claim similar to Meggison's claim here. The plaintiff in that case was a school district employee who helped monitor the school district's expenditure and disbursement of certain federal funds. *Omokehinde*, 563 F. Supp. at 720. Plaintiff informed her supervisor that she believed the school district was using federal funds for improper purposes. *Id.* After the supervisor ignored her, plaintiff restated her concerns in an anonymous letter to the *Detroit Free Press*. *Id.* at 721. Relying on information in the letter, the *Free Press* later published an article exposing various incidents of misconduct in the school district. *See id.* Plaintiff was fired shortly after the Free Press story broke. *Id.*

The *Omokehinde* Court held that neither plaintiff's internal complaint to her supervisor nor her anonymous letter to the paper were protected speech. *Id.* at 728. The court explained:

> Plaintiff's complaints to her supervisor about questionable Title I expenditures flowed directly form her duties and responsibilities as an employee of the Defendant School District. When her protests through the chain of command proved unavailing, she repeated precisely the same complaints to an outside audience. This Court fails to see how the broader dissemination of precisely the same speech alters the fundamental nature of the underlying communication, such that what was once a part of the employee's official duties becomes the speech of a private citizen.

*Id.* at 728.

Like the plaintiff in *Omokehinde*, Meggison took an internal complaint about workplace conditions to a public audience. Meggison effectively concedes that the substance of her speech at the February 28 Board meeting is exactly the same as the statements she made internally to Sheriff Lasater on February 22. (*See* Meggison at 155) (stating "I told the sheriff in the meeting on the 22nd that . . . the staff felt there was a cover-up and that they were being blown off"). Like the police officer's speech in *Haynes*, Meggison's statement to Sheriff Lasater are "best characterized as [those] of a disgruntled employee." *See* 474 F.3d at 364. Meggison's decision to disseminate her

- 14 -

employment grievances to a wider audience does not cloak those grievances with First Amendment protection. *See Omokehinde*, 563 F. Supp. 2d at 728-29; *see also Andrew v. Clark*, 472 F. Supp. 2d 659, 662 n. 4 (D.Md. 2007) ("The 'internal memorandum' prepared by Andrew never lost its character as speech pursuant to his official duties simply by virtue of the wider dissemination he elected to give it after his recommendations were ignored by the police commissioner.") This is especially true here because Sheriff Lasater specifically invited Meggison to address the Board after Meggison complained internally to him. Ms. Meggison is not an average citizen who happens to be a public employee. Her extensive knowledge of the air quality issue and her presence at the meeting are a direct result of her position as Jail Administrator. In her statements to the Board she referenced reports and studies she helped commission for the jail, and she relayed the concerns of the jail staff as a whole. These statements simply do not qualify as citizen speech within the meaning of *Garcetti* or the Sixth Circuit cases interpreting *Garcetti*.

The Court concludes that, as a matter of law, Plaintiff's speech is not entitled to First Amendment protection. Therefore, Plaintiff cannot establish a prima facie case of First Amendment retaliation, and Defendants are entitled to summary judgment on Plaintiff's § 1983 claim. Because the Court finds there is no First Amendment violation, it is not necessary to address Defendant Lasater's qualified immunity defense. *See Haynes*, 474 F.3d at 365.

### III.     State Law Whistle-Blowers' Protection Act Claim

In Count II of her Amended Complaint, Meggison claims Defendants violated the Michigan Whistle-Blowers' Protection Act ("WBPA"), M.C.L. 15.361, *et. seq.* by discriminating against her regarding the "terms benefits, conditions and privileges of her employment because she reported a violation or suspected violation of law." (Docket #37, ¶ 45.) The WBPA states in pertinent part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

*Id.*, § 15.362.

To state a claim under the WBPA Meggison must show that (1) she was engaged in an activity protected by the statute; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action. *See Thompson v. Aramark Sch. Support. Srvcs., Inc.*, 490 F.3d 506, 509 (6th Cir. 2007) (citing *West v. Gen. Motors. Corp.*, 469 Mich. 177 (2003)). Meggison asserts that she spoke out at the February 28 Board meeting because she reasonably suspected that Charlevoix County had failed to comply with its legal duty to maintain and repair County-owned buildings.[1] (Meggison at 166-68; Plaintiff's Response, docket #55, at 26-28.) The parties disagree as to whether Meggison's statements were "protected activity" within the meaning of the WBPA. (Defendants' Brief in Support, docket #53, at 22-26; Plaintiff's Response, docket #55, at 26-28.) The Court need not address the parties' arguments on that element of Plaintiff's prima facie case because Meggison has not presented evidence sufficient

---

[1] M.C.L. § 691.1406 states "Governmental agencies have the obligation to repair and maintain public buildings under their control when open for use by members of the public." Additionally, M.C.L. § 46.7 states "It shall be the duty of the [County Board of Commissioners], as often as shall be necessary, to cause the courthouse, jail, and all other public buildings and public officers of the county, to be duly repaired at the expense of the county."

to establish that she was subjected to an adverse employment action. Consequently, Defendants are entitled to summary judgment on Plaintiff's WBPA claim.

Michigan courts analyzing WBPA claims look to federal and state case law interpreting the civil rights statutes to determine what constitutes an "adverse employment action."[2] *Jones v. City of Allen Park*, 167 Fed. Appx. 398, 406 (6th Cir. 2006); *Radtke v. Everett*, 442 Mich. 368, 381-82 (1993). As the *Jones* Court noted:

> These cases hold that an adverse employment action is an employment decision that is materially adverse in that it is more than a mere inconvenience or an alteration of job responsibilities. Typically, this includes termination, demotion, diminished pay, a less distinguished title, a material loss of benefits, significantly diminished responsibilities, or other unique indices.

167 Fed. Appx. at 406; *accord Pena v. Ingham Cty. Road Comm'n*, 225 Mich. App. 299, 311 (Mich. App. 2003); *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 886-87 (6th Cir. 1996). Whether an action is materially adverse is an objective inquiry. *Pena*, 225 Mich. App. at 311. Plaintiff's "subjective impressions" of defendant's actions are not controlling. *Id.*

Meggison acknowledges that Defendants have never formally disciplined her – much less fired her – for her speech. (Meggison at 105.) She remains on leave up to this very day, with a workers' compensation claim pending. Despite this, Meggison takes a two-pronged approach in

---

[2] At oral argument, Plaintiff's counsel urged the Court to draw on First Amendment case law to determine what constitutes an "adverse employment action" for the purposes of the WBPA. The Sixth Circuit has held that a plaintiff asserting a First Amendment retaliation claim under 42 U.S.C. § 1983 must show that defendant's adverse action caused him to suffer an injury that "would chill an ordinary person in the exercise of his First Amendment rights." *Taylor v. Keith*, 338 F.3d 639, 643 (6th Cir. 2003). To the extent this standard requires a different analysis than the standard typically used in state and federal employment discrimination statutes, neither party briefed this issue and the Court is unaware of any Michigan case law applying this standard to a WBPA claim. The Court will apply the well established test used in all types of other employment related civil rights claims, including retaliation claims.

attempting to establish an adverse employment action. First, she alleges that following the February 28 Board meeting Sheriff Lasater (1) refused to speak with her and excluded her from personnel meetings; (2) "investigated her activities" and accused her of having a "clandestine meeting" with a local reporter; and (3) removed "two or three" employees out from under her supervision. (Plaintiff's Response, docket #55, at 29-31.) Meggison claims that these incidents are adverse actions because they "undermined her ability to perform her job." (Amended Complaint, docket #37, ¶ 32; Meggison at 179-80.) Second, Meggison claims that the stress and anxiety caused by these actions rendered her physically and mentally unable to work such that she was constructively discharged. (Plaintiff's Response, docket #55, at 29-30; Meggison 198-99.)

Even when viewed in the light most favorable to Plaintiff, none of these actions constitutes a materially adverse employment action under the controlling objective test of adverse actions. As a threshold matter, Plaintiff makes no claim that that she has ever been fired, demoted, transferred or reassigned, and her salary and benefits remained exactly the same following the February 28 Board meeting. As to Plaintiff's claims that Sheriff Lasater refused to speak with her, excluded her from personnel meetings, accused her of secretly meeting with a reporter, and "investigated her activities," Meggison fails to identify how any of these acts affects any material aspect of her job. *See Pena*, 255 Mich. App. at 312 ("[B]ecause no term or condition of plaintiff's employment was affected . . . plaintiff did not suffer an adverse employment action.") Even if Sheriff Lasater avoided Meggison following the Board meeting, "the mere fact that an employee is displeased by an employer's act" does not mean the act is materially adverse. *Id.* at 312. Furthermore, as the *Pena* Court noted, "ostracism or isolation is not the sort of conduct that rises to the level of an adverse employment action." *Id.* at 315. Indeed, on the undisputed facts of this record, Meggison herself

took leave from her job just nine days after her public speech. Of these nine days, Sheriff Lasater was on vacation for at least four of them. (Meggison at 68; Lasater at 133.) On any objective test, the remaining five days would be insufficient to establish a pattern of ostracism in any event.

Sheriff Lasater's decision to transfer employees out from under Meggison's supervision theoretically could have some effect on her job status or responsibilities, but Meggison fails to establish that the effect was objectively significant in this case. *Cf. Jones*, 167 Fed. Appx. at 406 (noting that a "significant" reduction in job responsibilities can constitute an adverse employment action). Plaintiff testified that she supervised approximately twenty-five employees at the jail. (Meggison at 24, 187.) Transfer of two or three of these employees did not alter Meggison's overall status or responsibilities as Jail Administrator. *See Kocsis*, 97 F.3d at 886 (no adverse action where nurse retained same salary and benefits after being transferred to a new position with less supervisory authority). Meggison retained significant supervisory authority, and all other aspects of her employment remained exactly the same following the February 28 Board meeting. Although Meggison testified that she feared these actions would "snowball" into a total loss of authority, her subjective fear about future job responsibilities does not constitute a materially adverse action. *See*, *e.g.*, *Pena*, 255 Mich. App. at 311 (noting that Plaintiff's own "subjective impressions" about her employer's actions do not determine whether the action was adverse."). Based on these facts, Meggison simply cannot establish that any of Sheriff Lasater's actions had a significant effect on the material terms or conditions of her employment at the Charlevoix County Jail.

Similarly, Meggison cannot show that Defendants' actions, taken collectively, constitute a constructive discharge in violation of the WBPA. Constructive discharge occurs only where an employer "deliberately makes an employee's working conditions so intolerable that the employee

is forced into involuntary resignation." *Vagts v. Perry Drug Stores, Inc.*, 204 Mich. App. 481, 487 (1994). To maintain a claim for constructive discharge, the employee's reactions to the employer's conduct must be objectively reasonable. *See Champion v. Nationwide Security, Inc.*, 450 Mich. 702, 710 (1996). Absent extraordinary circumstances, Michigan courts find constructive discharge only where the employer's conduct is "continuous and pervasive." *See Backer v. Wyeth-Ayerst Labs.*, 949 F. Supp. 512, 519 (W.D. Mich. 1996).

Plaintiff Meggison fails to present evidence sufficient to allow a reasonable jury to conclude that she was constructively discharged. Only nine days passed between the Board meeting and the date Meggison left the jail on sick leave. There is no evidence that Defendants deliberately took steps to force plaintiff into resignation, and Plaintiff has not actually resigned. Assuming *arguendo* that Meggison is physically and mentally unable to perform her job, her reaction to Defendants' conduct was not objectively reasonable. In total, Meggison's constructive discharge claim is little more than a subjective fear that she would one day be fired. Such a fear is insufficient to establish constructive discharge. *See*, *e.g.*, *Jacobs v. St. Clair Cty.*, 163 Mich. App. 230, 236 (1987). Consequently, Plaintiff's WBPA claim fails as a matter of law.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (docket #52) is granted. Plaintiff's claims are dismissed with prejudice.


Dated:   December 23, 2008              /s/ Robert J. Jonker
                                         ROBERT J. JONKER
                                         UNITED STATES DISTRICT JUDGE